**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BYD SPORTS, LLC,
BYD MANAGEMENT, LLC

Civil Action No. 1:24-cv-9335

Plaintiffs,

-against-

**COMPLAINT**

DON KING,
DON KING PRODUCTIONS, INC.,
DOE CORPORATIONS 1-10,
DOE BENEFICIARIES 1-10 .

Plaintiffs
Demands Trial
by Jury

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

.

-------------------------------------------------------------------------x

The Plaintiffs BYD Management LLC and BYD Sports LLC (hereinafter collectively

"BYD") by their attorney's The Law Offices of Anthony J.M. Jones, as and for its complaint

against Defendants alleges as follows:

**PRELIMINARY STATEMENT**

- Don King, a flamboyant and controversial boxing promoter, built his empire on the backs

  of some of the greatest fighters in history, but his career has been plagued by allegations

of corruption, exploitation, and deceit. Known as much for his towering hair and showmanship as for his ability to orchestrate major boxing events, King has faced a litany of lawsuits and accusations from the very athletes whose careers he managed.

- King's most notable legal battles involved some of the sport's biggest names, including Mike Tyson, Muhammad Ali, and Larry Holmes. Tyson, arguably King's most lucrative client, sued him in 1998 for $100 million, alleging that King had stolen millions through fraudulent business practices and exploitative contracts. Tyson described King as a "ruthless, deplorable, greedy, and selfish" individual, accusing him of skimming profits and exploiting his lack of financial acumen during a vulnerable time in his life.

- Larry Holmes, another heavyweight champion, also accused King of underpaying him and mishandling funds. Holmes famously remarked, "Don King has ruined more lives than cancer."

- Muhammad Ali, a cultural and sports icon, sued King for underpayment of fight earnings, further tarnishing King's public image. These lawsuits painted a picture of a promoter who prioritized his own financial gain over the welfare of his fighters.

- King's legal troubles extended beyond his dealings with boxers. In 1999, he was sued by Lloyd's of London for allegedly inflating the value of canceled boxing matches to claim excessive insurance payouts. Although King denied wrongdoing, these allegations reinforced perceptions of him as a figure willing to manipulate circumstances for personal profit.

- Critics have argued that King exploited systemic vulnerabilities in boxing, where fighters often come from disadvantaged backgrounds and lack the knowledge to navigate complex contracts. King's ability to wield charm and intimidation enabled him to

2

dominate the industry, but it left a trail of disillusioned and financially damaged athletes in his wake.

- In his dealings with the Plaintiffs, Mr. Cecil Miller, CEO of "BYD", Mr. Don King claimed that his dealings of the past were behind him, that he had "found Christ" after the passing of his ex-wife and wanted to rectify his past reputation in his remaining years working with upcoming talent like Mr. Miller; a preacher's son, with a clean reputation in boxing.

- Mr. King presented Mr. Miller with the opportunity that critics would say put Mr. King on the map, by hosting a fight in Africa.   A fight between George Foreman and Muhmammad Ali put this little known boxing promoter on the map and grossed $100 Million dollars or today's equivalent to $600 Million dollars as approximately over 1 billion people saw the fight globally.  This event, as historically noted, was instrumental in building the Defendant's later career over the following 50 years.

- Although, at the writing of this complaint, being 93, it appears that Don King has not in any way steered from his negative past and did not sincerely want to help the next generation as he so portrayed.

- While Don King undeniably brought unprecedented attention and spectacle to boxing, his legacy is marred by accusations of greed and betrayal that the Plaintiff brings today. The stories of litigation and mistrust from his fighters and business partners overshadow his contributions, leaving him as a polarizing figure in sports history—celebrated for his promotional genius but condemned for his alleged exploitation and unethical practices.

3

### **JURISDICTION AND VENUE**

This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds this of $100,000.00.  Jurisdiction is also appropriate pursuant to contractual agreement.

Venue lies in the district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events rise to the claims herein in the Southern District of New York, and a the time of commencing this actions, Defendants were subject to personal jurisdiction in the Southern District of New York..

### **PARTIES**

At all times hereinafter mentioned, Plaintiff BYD, were duly registered limited liability companies of the State of Virginia, County of Richmond.

At all times hereinafter mentioned, Defendant Don King Productions, Inc. (hereinafter referred to as "DKP") was and is a corporation organized under the laws of the State of Delaware and doing business in New York County with a principal place of business located at 501 Fairway Drive,  Deerfield Beach, FL 33441.

Defendant Doe Corporations 1-10 (hereinafter referred to as "DKP") are corporations and entities affiliated and associated with Defendants Don King and the Defendant Corporations. At all relevant times, Defendant Doe Corporations 1-10 were affiliated with Plaintiff and Defendant within the meaning of all applicable statutes.

Defendant Doe Beneficiaries 1-10 (hereinafter referred to as "DKP")  are corporations, individuals, assigns and entities affiliated and associated with Defendants Don King and the

4

Defendant Corporations. At all relevant times, Defendant Doe Beneficiaries 1-10 were affiliated with Plaintiff and Defendant within the meaning of all applicable statutes.

### FACTS

1.      On February 16, 2021 , Cecil Miller, CEO of BYD, an established music manager, boxing manager and boxing promoter entered into an agreement (Exhibit 'A') with and on behalf of boxer Alonzo Butler with Don King Productions, Inc. ("DKP") at DKP's offices in Florida.  The agreement laid out terms and conditions for a bout and promotional agreement for Alonzo Butler for upcoming fights.  BYD signed the agreement with DKP and DKP principal, Mr. Don King.



**Richmond Free Press**

Home   News   Opinion   Faith   Entertainment   Sports   Black Experience

Local promoter helps boxer make comeback

Fred Jeter | 3/11/2021, 6 p.m.

from left, Richmond promoter Cecil Miller, Yoel Judah, Don King and boxer Alonzo "Big Zo" Butler at Don King Productions headquarters in Deerfield Beach, Florida in February

https://richmondfreepress.com/news/2021/mar/11/local-promoter-helps-boxer-make-comeback/ [1]

---

[1] Pictured:  BYD Promoter Cecil Miller, Yoel Judah, Don King and boxer Alonzo Butler in Don King's offices in Florida on March 2021

5

2.      On August 28, 2021, the heavyweight boxing event occurred as scheduled between Alonzo Butler and Brandon Spencer.

3.      Following the bout and as time progressed, the Defendant and Mr. Miller of BYD developed, in addition to their contractual relationship, a working relationship wherein the Defendant shared that he was putting together a Rumble in The Jungle 2 to commemorate the 50th anniversary of the boxing match between Muhammad Ali and George Foreman in Kinshasa Zaire in 1974. Mr. Miller was excited to hear about it and told Mr. King definitely wanted to get a ticket and to let him know when more details were available. To be noted, the original fight between Foreman and Ali grossed $100 Million dollars or today's equivalent to $600 Million dollars as approximately over 1 billion people saw the fight globally[2]. This event, as historically noted, was instrumental in building the Defendant's later career over the following 50 years.

4.      In the following weeks and months, Mr. Miller and Defendant continued to work together on various projects with Mr. Miller bringing DKP, without objection, opportunities for licensing and branding; all with DKP's support and without any material objection to Mr. Miller doing so   In addition, in honor of Mr. Miller's work, DK gave Mr. Miller a rare collectible coin symbolizing their relationship and took time to speak with Mr. Miller's father and young daughter   (Exhibit 'B').

5.      Approximately 1 year passed and during that time Mr. Miller had been to Mr. King's home, met his family and continued to learn from the Defendants. Mr. Miller brought up again the Rumble In the Jungle 2 that the Defendant had brought up and asked how the progress was going. At that time, Mr. King, now 92 years old, informed Mr. Miller that not much progress had been made. To Mr. Miller, it was clear that Mr. King needed some help

---

[2] Link

6

and offered his assistance in putting on the fight in Africa in 2024.  Mr. King agreed, but wanted a proposal in writing on what a deal  might look like.  Mr. Miller believed that the Defendant was acting in good faith.

6.      Through counsel, BYD provided a proposal that was sent to Mr. King and his attorney repeatedly from August 2023 to February 2024 (Exhibit 'C').   Although the receipt was acknowledged by DKP's team, there has never been a written response to the proposal to date.

7.      However, in the meantime, Mr. King continued to ask Mr. Miller verbally about how the progress was going, insisting that he continue to plan for the Rumble In the Jungle 2 anniversary fight.  At this time, Mr. Miller had engaged with bankers in Africa, the US and counsel of which he informed Mr. King.  Mr. King seemed pleased with the progress, yet was reluctant to do any signed agreement.   As noted, the Defendant mentioned that he has a long history of litigation wherein his reputation has been less than credible in this Court and others and preferred to do things verbally.

8.      In lieu of a formal agreement, both Mr. Miller and Mr. King agreed to do a video wherein Mr. King would confirm that he was working with Mr. Miller on Rumble In the Jungle 2  to ensure all third parties and in addition to their other business with Butler (Exhibit 'D')

9.      In addition, Mr. Miller began working with various staff at DKP to procure tables and ticket sales for fights in Florida.  Mr. Miller was convinced that selling sponsorships and promotions would help DK want to work with him on Africa fights or get things locked down (Exhibit 'E').  This was confirmed additionally with employees within DKP and others.

10.     Progress continued being made by Mr. Miller with sites for the anniversary fight and proposals sent to African countries such as Burkina Faso and the Republic of Ghana and their representatives; news that Mr. Miller would update Mr. King on periodically.  To procure interest in the endeavor, Mr. Miller and joint venture partner Entegrity Sports sent out letters requesting interest in hosting the fight with no mention of DKP at all but for the mention of "working with the original promoters of Ali vs. Foreman".  These letters were sent out in October 2023.   (Exhibit 'F')

11.     On or around January 2024, Mr. Miller ventured to Florida to meet with DKP with the specific intention of discussing Rumble In the Jungle 2 and the progress that had been made per their previous phone calls and discussions.  Mr. Miller informed Mr. King that The Republic of Ghana was being considered but Mr. King's office informed Mr. Miller that no move would be considered valid unless there was an official invitation from the "Government".

12.     Eventually, Mr. Miller informed Mr. King that Nigeria may be a good fit, because they had an upcoming festival that was being promoted called the Global Entrepreneurship Festival (hereinafter referred to as "GEF") and that a partnership could be possible to bring the fight to Nigeria.  At no point however, was his name or likeness or logo used to procure any contract.   At no point did DKP or DK object to any of the representations made by Mr. Miller.

13.     On or about May 2024, it became aware to by a mutual colleague, Mr. Charles Smith[3], that DK's daughter was working on a similar event in Africa for the commemoration of the 1974 fight in the original Democratic Republic of Congo, the former Zaire, where the original fight was fought.  Mr. King's daughter was seeking $50 Million from a foreign

---

[3] Mr. Smith collaborates this statements in affidavits and testimony

8

government for the fight and had apparently some investment lined up.   At this point, Mr. Miller, infuriated, insisted that if Mr. King wanted his daughter to do this, he would back out. Mr. King insisted that his own daughter had a bad history and was not to be trusted as she had some previous run-ins with misrepresentations of her own father.

14.     Mr. King ensured that he would handle his own daughter so as to ensure that Mr. Miller and BYD completed the task assigned to make new history with an 50th Anniversary fight that no one else seemed to make any significant progress on.

15.     After Mr. King's assurances, Mr. Miller and counsel relied on such advice and continued working on making the fight a reality in Africa.   DKP's assurances went as far as stating that he himself wanted to do the "Fight Card" (a list of the actual boxers that would participate in the bouts) as that would be his own 'reputation on the line'.   These statements were heard by multiple third parties[4].

16.     Continuing to rely upon DKP's assurances, BYD and GEF enter into an Memorandum of Understanding (MOU) based on the proposal sent above.   GEF and BYD agreed to a series of fights over five (5) years to be held at the GEF festival in Akure, Ondo State Nigeria.  The GEF festival was built as a "Aspen" level event for the world's wealthiest to converge in Akure, Nigeria to do business in a secluded exclusive space.  Invited guests were world leaders, political leaders, heads of state and heads of industry.   (Exhibit 'K')

17.     Subsequently, Mr. Miller and counsel continue to work independently, waiting on DK's fight card.  To support the upcoming festival and announce that history would be made hosting the 50 year anniversary of Ali vs. Foreman, GEF announced that it is having a press conference for the promotion of the festival as the "Biggest Entrepreneurial Event in the World".   On July 18, 2024, GEF officially, through BYD and counsel, invited DK to a press

---

[4] Affidavit of Prince Riley

release which just happened to be on Defendant's 93rd birthday in Lagos, Nigeria.  Due to DK's age and time zones, it would possibly be only a video appearance on Zoom.   (Exhibit 'L').  It appeared history was aligning but DKP was still avoiding all communications.

18.     As confirmed by multiple DKP representatives, the letter from the Nigerian government was received in due course by DKP, with a Ms. Vonda Carson, an executive with DKP saying she put the letter on Mr. King's desk directly.

19.     Unfortunately, following the official governmental letter, specifically requested by DKP's office, from July 2024 and October 28, 2024, DK continues to refuse to answer phone calls or emails from BYD in regards to the opportunity.  However, the boxing community is starting to take notice with expressions of interest from the top boxers in the world expressing willingness in appearing, including the lineage of Muhmmad Ali and George Foreman expressing interest in participating.

20.     Still, DKP refuses to respond to any correspondences which lead BYD to discover that DK does not even own the rights to "Rumble In The Jungle" as he was stating; instead it is owned by Authentic Brands, Inc..  Apparently, DKP was holding himself out as the rightful custodian of "Rumble In The Jungle" but in fact it was held by Ali Enterprises, Inc. (*As it was Muhammad Ali whom created the phrase "Rumble In The Jungle" not DK*) and not DKP.  (Exhibit M - Trademark). With this information, BYD decides now to reach out to Authentic to possibly license the name but also begins to go by the "Freedom Belt", which has no association with either DK or Authentic.

21.     On August 23, 2024, GEF held a press conference wherein counsel for BYD announced that GEF would be "hosting a fight at the Festival" in honor of Ali vs. Foreman some 50 years prior.  Further, it was announced that BYD nor his attorney represent DK

10

personally, but that they have an existing contract and at minimum would like to honor him for his achievements. Since the GEF was about entrepreneurism, DK was the type of entrepreneur that should be potentially honored. (Exhibit 'N')

22. Continuing without the help from DKP, BYD with the pressure of a now secured Fight Date of November 23, 2023 bearing down, begins to secure the fight card, promotions, and arrangements in Nigeria, all under BYD not DKP or any associated entities. The November fight at GEF was to feature world champions Sugar Shane Mosely versus Victor Ortiz with an undercard of Lateef Kayode versus Samuel Peters; all who signed a form of bout agreement or Letter of Intent to participate. (Exhibit 'O'). In addition to the fight venue set for Akure, Nigeria, Pay Per View was also procured with an Amazon Sports affiliate with no help from DKP as well as sponsorship interests. With promotion and ticket partners set in place, tickets were set to go on sale November 1, 2024 through the ticketing partners BYD put in place.

23. Further, BYD received boxing sanctioning licenses in Nigeria to host a fight and was down to coordinating final Logistics; all again with no mention of DKP or DK as it was not required to do so to have a fight in Africa. (Exhibit 'P') Sponsors were also in the final stages of being secured for flight sponsorships for all participants from the USA to Nigeria as well as visa support from Nigerian and US government officials.

24. On or about October 28, 2024, DK calls Mr. Miller with Mr. Yoel Judah on the phone to state that he suddenly now has no idea what Mr. Miller is doing in Africa, which caught Mr. Miller completely took by surprise. The two began to argue about the recollection of previous events with Mr. Miller stated repeatedly that Dk "gave me his blessing (to do "Rumble In The Jungle")" on video and in front of many witnesses. Further, Mr. Miller

11

states that DK's lack of response left him no choice but to fulfill his existing obligations to the festival with or without DKP's involvement.   DK states that he does not remember and upon hearing that BYD has a 5 year deal in Africa, DK insists he will send a 'Cease and Desist' to shut down the whole event, including ceasing the use of "Freedom Belt", and "Rumble In The Jungle 50th Anniversary" which DKP did not even own.  The Cease and Desist went to all future events as well, all based upon the fabrication that DKP doesn't even know the Mr. Miller and that DKP owned or controlled brands he did not.   (Exhibit 'Q').

25.     The irony however, given Mr. King's history is borne on him.  DKP claimed they had no knowledge of the event, yet, surprisingly, they knew exactly whom to send their cease and desist to in the Nigerian Government, directly sending contacts provided by BYD based on the initial letter prompted by BYD in July.  In this appalling act, DKP was essentially stating that no African American promoters could host an event in Africa without him; as preposterous as this sounds on its face, its effect on individuals on the continent held weight.

26.     As a result of DKP's letter, the Nigerian Government Officials canceled the fight as culturally, whether the allegations Mr. King was stating whether they were true or not, they created embarrassment to the officials involved.  The Nigerian government officials repeating the lies alleged by Mr. King stating he had no affiliation with Mr. Miller even though DKP was used on no promotion or planned promotion material.   (Exhibit 'R').

27.     The GEF event went on as scheduled between November 22-24 with businesses and high level individuals participating from around the globe, including a few billionaires whom the efforts of both BYD and GEF were targeting, attended to make a historical event.

**FIRST CAUSE OF ACTION**

12

**To All Defendants:  Tortious Interference with Economic Relations**

28.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

29.     The Plaintiff had business relations with a third party, GEF and the Nigerian government through Memorandum of Understanding, signed July 2024.

30.     The Defendants interfered with those business relations by sending a knowingly fabricated, misleading and false cease and desist letter alleging they had no affiliation with Cecil Miller and/or BYD after finding out that BYD and GEF had a business relationship for an upcoming fight in Africa at the GEF Festival;

31.     The Defendant acted with the sole purpose of harming the Plaintiffs by using unlawful defamatory means to send a cease and desist letter misleading the Nigerian Government that Plaintiff was using Defendants' brands without authorization, while he was not, and that Plaintiffs and Defendant had no affiliation, in spite of the fact that Plaintiff and Defendant had an existing contract and ongoing discussions about putting a fight on in Africa.

32.     As a cause of the Defendants' pugnacious and tortious actions, the Nigerian Government cancelled the fight to be put on by Plaintiffs citing specifically Defendants' grossly misleading Cease and Desist Letter.

33.     Because of Defendants' tortious actions, Plaintiffs' was severely financially injured, with the efforts of almost 3 years of planning stopped at the finish line and all forecasted revenue had been stifled because of Defenandats' tortious actions.

## SECOND CAUSE OF ACTION

**To All Defendants:  Tortious Interference with Prospective Business Relations**

13

34.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

35.     The Plaintiff had prospective relations with GEF and many business third parties for sponsorships as evidenced by MOU and Defendants' knew of these opportunities and even requested Plaintiffs' assistance Defendants in procuring sponsorships as shown above. Further, in an argument between Plaintiffs and Defendants, Defendants' discovered that Plaintiff had a 5 Year deal with GEF and the Nigerian government to host the Event(s).

36.     The Defendants interfered with those prospective business relations by sending a knowingly misleading and false cease and desist allegeding they had no affiliation with Cecil Miller and/or BYD and that BYD was somehow using DK for profit, which it was not;

37.     The Defendant acted with the sole purpose of harming the Plaintiffs by using unlawful defamatory means.

38.     The resulting injury to the prospective business relationships because of Defendants' actions.  The anniversary fight and subsequent fights for the following years have been canceled on the account of Defendants' tortious and reckless actions.  Plaintiffs' efforts were stopped in their tracks and all forecasted revenue had been stifled because of Defenandats' tortious actions.

### THIRD CAUSE OF ACTION

**To All Defendants:  Defamation - Libel and Libel Per Se**

39.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

40.     The Cease and Desist letter sent by Defendants to the Nigerian Government contained false statements that Defendants had 'no affiliation' with Plaintiffs; a statement that Defendants knew was not true as evidenced by the facts and exhibits herein, there were many

'affiliations' with BYD none more clear than executed agreements.  Further, the Defendants alleged in the Cease and Desist letter that Plaintiff was using DK's name and likeness and authorization to procure opportunities with the GEF and others which Defendants' also knew or should have known was not true.  Defendants' letter also claimed to proclaim that it owned the rights to the "Freedom Belt" and "Rumble In Jungle 50th Anniversary" which it obviously did not.  In all correspondences and agreements with third parties, DK or DKP was never even listed as a party.

41.     These false statements were published to the Nigerian Government through the Cease and Desist letter which reached key political members and stakeholders and high level global individuals.  The Defendants actions went so far as to publicly post the Cease and Desist on all of DKP's social media in an effort to further defame Plaintiffs.  As of this complaint, the Cease and Desist falsities remain on Defendants' social media creating a continuing harm to Plaintiffs' credibility and ability to function in the sports and entertainment industries.

42.     Defendants acted with at minimum negligent intent or at most intense malice intent to damage Plaintiffs', a private individual's, standing with the many stakeholders of the Government and individuals abroad to discredit potential opportunities.

43.     The false statement caused harm to the Plaintiff's reputational or business interests as evidenced by the Nigerian government canceling the event and other professional harm through Defendants publication aimed at harming Plaintiffs.

## FOURTH CAUSE OF ACTION

### To All Defendants: Negligent Misrepresentation

44.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

45.     The Defendant had a duty of fiduciary and fair dealings, as a result of a special relationship, to give correct information to BYD based on their pre-existing relationship from their existing contract;

46.     The Defendant made a false representations that he should have known was incorrect in that he had the power to sell the rights to Rumble In the Jungle based on his previous involvement;

47.     The information supplied in the representation was known by the Defendant to be desired by the Plaintiffs for a serious purpose of making another historical boxing event on the continent of Africa;

48.     The Plaintiffs intended to rely and act upon this information by making appropriations ready for said fight on November 23, 2024 including securing top name boxers, Pay Per View, boxing sanctioning licenses and sponsorship opportunities.

49.     The Plaintiffs reasonably relied on this representation of Defendants to his detriment when it became aware that DK does not own Rumble In The Jungle and would have further negotiated with other parties to acquire the license that DKP was holding himself out to represent.

50.     The resulting misrepresentation by Defendants' caused Plaintiffs to lose valuable time promoting a once in a lifetime 50th anniversary fight and caused Plaintiffs to lose potential sponsors and opportunities as a result.

**FIFTH CAUSE OF ACTION**

**To All Defendants: Fraud in the Inducement**

51.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

16

52.    The Defendants made a false representation about a material fact that he had the rights to "Rumble In The Jungle" and could determine how they were used in a potential fight in Africa.

53.    The Defendants knew the representations were false as he in fact did not own such rights.

54.    The Defendants intended to deceive the Plaintiffs into getting Plaintiffs to do work of putting together a fight for a brand he did not own.

55.    The Plaintiff relied on theses representations and the Plaintiff did not know the representation was false

56.    The Plaintiffs suffered damages as a result of this fraudulent inducement by Defendants holding themselves as rights holders, wasting Plaintiffs' time and relationships in the process causing damage to loss of time and efforts.

### SIXTH CAUSE OF ACTION

**To All Defendants:  Breach of Contract**

57.    Plaintiff repeats and realleges each allegation set forth previously in this complaint.

58.    A party may recover under a breach of contract claim because there was a verbal contract that was enforceable.

59.    Here, although Plaintiff and Defendant had a verbal contract to work together on the Africa fight, it was a clear and unambiguous promise with Defendants' giving his "blessing" to do the event on camera, asking and following up on its progress through numerous phone calls and even blocking his own daughter from competing to doing an African event.

60.    As a result, a reasonable and foreseeable reliance by Plaintiff of whom the promises were made that Plaintiff would at minimum support the event and collaborate with Plaintiff

17

61.     Because of Defendants' actions, an injury sustained by Plaintiffs resulting from the reliance on Defendants and Defendants' ultimately deciding, without merit whatsoever, that they were not affiliated with Plaintiff.

## SEVENTH CAUSE OF ACTION

### To All Defendants: Promissory Estoppel

62.     Plaintiff repeats and realleges each allegation set forth previously in this complaint.

63.     A party may recover under a promissory estoppel claim only in the absence of an enforceable contract.

64.     Here, although Plaintiff and Defendant had no clear contract to work together on the Africa fight, it was a clear and unambiguous promise with Defendants' giving his "blessing" to do the event on camera, asking and following up on its progress through numerous phone calls and even blocking his own daughter from competing to doing an African event.

65.     As a result, a reasonable and foreseeable reliance by Plaintiff of whom the promises were made that Plaintiff would at minimum support the event and collaborate with Plaintiff

66.     Because of Defendants' actions, an injury sustained by Plaintiffs resulting from the reliance on Defendants.

## PRAYER FOR RELIEF & JURY DEMAND

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     on the first cause of action, directing Defendants' to pay money damages in the amount of not less than $600,000,000 in, compensatory, treble and expectation damages;

(b)     on the second cause of action, directing Defendants to pay money damages in an

18

amount to be determined at trial but not less than $2,400,000,000 for the prospective damages of causing four additional years of revenue losses.

(c)        on the third cause of action,  defamation, directing Defendants to pay money damages in an amount to be determined at trial but not less than $500 per social media follower times the amount of days Defendants continue to keep posts active on their sites or $75,000,000, whichever is greater, in addition to a formal written apology, retracting false statements.

(d)        on the fourth cause of action of negligent representation, directing Defendants to pay money damages in an amount to be determined at trial but not less than $5,000,000.

(e)        on the fifth cause of action (fraud in the inducement), directing Defendants to pay money damages in an amount to be determined at trial but not less than $8,000,000.

(f)        on the sixth cause of action breach of contract, directing Defendants to pay the amounts determined at trial including additional compensatory, treble, punitive and expectation damages.

(g)        on the seventh cause of action promissory estoppel, directing Defendants to pay the amounts determined at trial including additional compensatory, treble, punitive and expectation damages.

(h)        other relief, together with the above relief, that this Court issue a judgment against the Defendant for costs, fees, attorneys' fees, and interest and such other legal or equitable relief that is appropriate.

Respectfully submitted by their attorneys

Anthony J.M. Jones, Esq.

19

THE JONES FIRM
NYS Bar no:  4354577
Admitted SDNY
1441 Broadway Ste 6
New York, NY 10010
ajones@jonesllp.com

Dated:  New York, New York
December 12, 2024